## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Krista Sellers,

                 Plaintiff,         Case No. 19-10993

v.                            Judith E. Levy
                                 United States District Judge

United States of America,

                 Defendant.     Mag. Judge David R. Grand

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [26]

This is a dental malpractice case. Before the Court is Defendant United States of America's motion for summary judgment regarding Plaintiff Krista Sellers' claims of dental malpractice under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et. seq.* (ECF No. 26.) Dr. Bruce Turpin is an employee of The Wellness Plan, a federally-funded dental clinic providing dental services in Pontiac, Michigan.[1] (*See id.* at PageID.235–236.) Plaintiff alleges that Dr. Turpin negligently performed

---

[1] The parties do not dispute (ECF No. 4, PageID.18; ECF No. 26, PageID.236) that as an employee of The Wellness Plan, Dr. Turpin is considered an employee of the United States under the FTCA. *See* 28 U.S.C. §§ 2671, 2674.

an inferior alveolar nerve ("IAN") block during her March 23, 2018 appointment to fill two of her teeth, resulting in paresthesia (i.e., numbness) on the left side of her tongue. (*See* ECF No. 4.)

For the reasons set forth below, Defendant's motion is GRANTED. Additionally, the Court grants summary judgment to Defendant pursuant to Federal Rule of Civil Procedure 56(f)(1) on Plaintiff's claims regarding retention of medical records. Accordingly, Plaintiff's amended complaint (ECF No. 4) is DISMISSED in its entirety.

## I. Background

### A. IAN blocks, generally

An IAN block is an injection that deposits an anesthetic near, but not in, the IAN, which innervates the teeth and gums in the lower jaw, to temporarily prevent sensation to the area. (*See* ECF No. 26, PageID.236; *see also* ECF No. 26-3, PageID.266; ECF No. 26-9, PageID.333). IAN blocks are a routine procedure for general dentists. (*See* ECF No. 26-3, PageID.271; ECF No. 26-6, PageID.294.)

"All injections into the human body are blind[.]" (ECF No. 26-18, PageID.388.) Therefore, to perform an IAN block, after a patient opens their mouth wide, a dentist must first discern anatomical landmarks in

the back of the mouth to determine the proper location in which to insert the needle. (*See* ECF No. 26-6, PageID.290; ECF No. 30-3, PageID.463–464.) Because it "is not possible to visualize the nerve as the needle is advanced during an injection[,]" (ECF No. 26-18, PageID.388), a practitioner may inadvertently contact a nerve—such as the nearby lingual nerve[2]—while administering an IAN block, even using proper technique. (ECF No. 26-18, PageID.388; *See also* ECF No. 26-4, PageID.280; ECF No. 26-6, PageID.292; ECF No. 30-3, PageID.467, 471.) One contributing factor to inadvertent nerve contact is individual anatomical variation; another is that the lingual nerve has between one to three fascicles (i.e., nerve fiber bundles) located between the proper needle insertion point and the IAN. (*See* ECF No. 26-18, PageID.388.)

Once an appropriate injection site has been identified, the needle is inserted gently until the needle contacts the patient's jawbone. (ECF No. 30-3, PageID.463–465.) The dentist then withdraws the needle approximately 2 millimeters, then aspirates the needle to look for the presence of blood to confirm that the needle is not in a blood vessel. (*Id.*)

---

[2] The lingual nerve provides sensation to the anterior two-thirds of the tongue on its respective side of the mouth. (*See* ECF No. 26-3, PageID.266.)

Because anesthetics are toxic to nerves, it is vital not to deposit the anesthetic directly into the nerve itself. (*See* ECF No. 26-6, PageID.290.) After aspirating, the dentist deposits the anesthetic solution. (ECF No. 30-3, PageID.463–466.) Once all the anesthetic has been deposited, the needle is withdrawn from the patient.

### B.   The March 23, 2018 IAN block

Dr. Bruce Turpin is a general dentist who has practiced general dentistry in southeast Michigan since 1980. (*See* ECF No. 30-4, PageID.482; ECF No. 26-5, PageID.285.) Dr. Turpin began treating Plaintiff at The Wellness Plan in July 2016. (*See* ECF No. 26-11, PageID.347–354; ECF No. 30-4, PageID.483.) Over the course of her years of treatment, Plaintiff was noted to be "[a]nxious[,]" to have "high sensitivity throughout the mouth[,]" and to be "difficult to anesthetize." (*See* ECF No. 26-11, PageID.350–351.) As a result, Plaintiff required anesthetic to tolerate routine procedures, including cleanings, during several previous dental appointments. (*See id.* at PageID.347–354.) Plaintiff had fillings performed by Dr. Turpin prior to the incident at issue. (*See* ECF No. 26-12, PageID.358.) Additionally, on at least one of those previous visits, Dr. Turpin anesthetized Plaintiff with a nerve

block, without complications. (*See* ECF No. 30-4, PageID.485; ECF No. 30-5, PageID.514.)

On March 23, 2018, Plaintiff was scheduled to have two cavities in two teeth filled on her lower left jaw. (ECF No. 26-11, PageID.354; ECF No. 26-12, PageID.357; ECF No. 30-4, PageID.485.) Dr. Turpin and Plaintiff discussed the need for the filling procedure, including an anesthetic injection in the form of an IAN block, and Plaintiff agreed to have them performed; the discussion did not include any warning that Plaintiff could be injured by any mandibular block (e.g., an IAN block). (ECF No. 26-4, PageID.280; ECF No. 26-12, PageID.357.)

To prepare Plaintiff for the IAN block injection, Dr. Turpin applied a topical anesthetic cream to numb the injection site. (ECF No. 26-12, PageID.358; ECF No. 30-5, PageID.515.) He inserted a 27-gauge needle into the left side of Plaintiff's bottom jaw area, and, after aspirating the needle, pushed the anesthetic Articaine through the needle. (ECF No. 26-4, PageID.278, 282; ECF No. 26-12, PageID.358; ECF No. 26-13, PageID.361.) While there is no evidence of the exact amount of time spent injecting the anesthetic in this instance, Dr. Turpin estimated that he

usually injects the anesthetic over the course of approximately 15 to 20 seconds. (ECF No. 26-4, PageID.278.)

According to Plaintiff, at the conclusion of the IAN block injection, her tongue felt as if she put it "into a light socket almost, like [an] electric tingling type [of feeling.]" (ECF No. 26-12, PageID.358.) She jumped up with the needle still in her mouth and yelled involuntarily. (*Id.*) Following her display of discomfort, Dr. Turpin ceased applying pressure to the needle and told Plaintiff that "it's okay," then took his hand from her mouth and removed the needle. (*Id.* at PageID.358–359.) Dr. Turpin completed the fillings, and Plaintiff felt numbness in the area for the remainder of the procedure. (*Id.*)

The day after the procedure, Plaintiff still felt numbness on the top of the left side of her tongue and called Dr. Turpin. (*Id.* at PageID.359.) Dr. Turpin advised Plaintiff that this was unusual but that the numbness would likely go away on its own; Dr. Turpin indicated that he and Plaintiff would check in again at her already-scheduled appointment on April 10, 2018. (*Id.*)

At the follow-up visit on April 10, 2018, Plaintiff discussed her lingering numbness with Dr. Turpin. (ECF No. 30-4, PageID.488–489;

ECF No. 30-5, PageID.517.) Dr. Turpin referred plaintiff to an oral surgeon that same day, noting that she exhibited paresthesia because "apparently [Plaintiff] had some damage to the lingual nerve as a result of the procedure." (ECF No. 26-4, PageID.279; ECF No. 26-12, PageID.359; ECF No. 26-13, PageID.360.)

Since the March 23, 2018 IAN block, Plaintiff has experienced paresthesia on the top left side of her tongue as well as periodic bursts of "a hot tingling feeling" on her tongue lasting for a few minutes in duration. (*See* ECF No. 30-5, PageID.516–519.) There is no evidence in the record of whether Plaintiff had any sort of procedure to confirm whether her lingual nerve was torn or blown out. (ECF No. 26-3, PageID.272.)

Plaintiff filed a complaint in this Court on April 4, 2019 (ECF No. 1), and an amended complaint on May 28, 2019. (ECF No. 4.) On July 11, 2019, Defendant filed an answer alongside affirmative defenses. (ECF No. 9.) On November 2, 2020, Defendant filed a motion for summary judgment on Plaintiff's claims for negligence. (ECF No. 26.) Plaintiff filed a response on December 14, 2020 (ECF No. 30), to which Defendant replied on January 8, 2021. (ECF No. 31.)

## II. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Analysis

Although it is difficult to discern the precise nature of Plaintiff's claims, Plaintiff appears to allege that Dr. Turpin engaged in medical malpractice based on the following acts or omissions: (1) administration of the IAN block (ECF No. 4, PageID.19–21); (2) failure to refer Plaintiff to a more competent dentist to perform the fillings (*id.* at PageID.21); (3) failure to provide informed consent for the procedure (*id.*); and (4) failure to refer Plaintiff to a more competent specialist to mitigate Plaintiff's

8

injuries (*id.* at PageID.21–22). Plaintiff also includes allegations regarding an alleged failure to create, maintain, and retain medical records as required by Michigan Dental Association Standards of Ethics and Code of Professional Conduct, Section 1-B, as well as the Michigan Public Health Code, Part 166, Section 333.16644. (*Id.* at PageID.23–24.) Defendant seeks summary judgment as to Plaintiff's medical malpractice claims. (ECF No. 26.)

As set forth below, there is no genuine issue of material fact that Plaintiff is not entitled to relief regarding any of her proffered theories of liability.

## A.   FTCA Medical Malpractice Claims

Under the FTCA, 28 U.S.C. §§ 1346(b), 2401(b), and 2671–2680, the United States may be held liable for personal injury caused by the negligent or wrongful act or omission of a federal employee "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Here, the allegedly negligent acts or omissions occurred in Michigan. Accordingly, federal law governs the procedural issues in the case, and Michigan law applies

to the substance of the claims. *See* 28 U.S.C. §§ 1346(b)(1), 2674–79; *Gallivan v. United States*, 943 F.3d 291, 294–95 (6th Cir. 2019).

To establish a claim of medical malpractice in Michigan, a plaintiff must set forth "(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 86 (2004) (footnote omitted); *see also* MCL § 600.2912a.

"As a general rule, Michigan courts require expert testimony in medical-malpractice cases, particularly for establishing the applicable standard of care and causation." *Kava v. Peters*, 450 F. App'x 470, 475 (6th Cir. 2011) (citing *Pennington v. Longabaugh*, 271 Mich. App. 101, 104 (2006) and *Thomas v. McPherson Cmty. Health Ctr.*, 155 Mich. App. 700, 705 (1986)). However, "there must be facts in evidence to support the opinion testimony of an expert." *Skinner v. Square D. Co.*, 445 Mich. 155, 173 (1994).

### 1. Whether Plaintiff established that Dr. Turpin's administration of the IAN block constituted malpractice

There is no dispute that Plaintiff suffered injury following Dr. Turpin's administration of the IAN block. The question remains whether Plaintiff has established that Dr. Turpin breached the standard of care in this IAN block administration in addition to establishing that any alleged violations of the standard of care caused Plaintiff's injury. Defendant asserts that Plaintiff has failed to do so. (ECF No. 26, PageID.233, 247–257.) Plaintiff disagrees. (ECF No. 30, PageID.419–431.) The Court finds that Defendant is correct.

> ### a) Plaintiff has not established that evidence of paresthesia is, alone, enough to demonstrate a violation of the standard of care

First, Plaintiff alleges that permanent paresthesia resulting from an IAN block is rare; because this complication is so rare, if it occurs, then it necessarily indicates that a dentist must have violated the standard of care in administration of the IAN block. (ECF No. 30, PageID.426.) In an action alleging malpractice by a general practitioner, to show a breach of the standard of care, the plaintiff has the burden of proving that:

in light of the state of the art existing at the time of the alleged malpractice:

> (a) the defendant . . . failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community[3] . . . .

M.C.L. § 600.2912a(1)(a). The "standard of care is founded upon how other doctors in that field of medicine would act and not how any particular doctor would act." *Cudnik v. William Beaumont Hosp*, 207 Mich. App. 378, 382 (1994).

In support of her assertion that permanent paresthesia is necessarily indicative of a violation of the standard of care, Plaintiff points to testimony of her retained expert Dr. Roger Druckman.[4]

---

[3] The Michigan standard of care for a general practitioner includes the "locality rule," that is, general practitioners must provide a standard of care complaint with professional standards of practice in the same or "similar community" as the one in which defendant practices. M.C.L. § 600.2912a; *Siirila v. Barrios*, 398 Mich. 576, 589 (1976) (articulating the "locality rule"); *see also Bahr v. Harper-Grace Hosps.*, 448 Mich. 135, 138 (1995) (in a malpractice case in Michigan, "the standard of care for general practitioners is that of the local community or similar communities[] and is nationwide for a specialist.") (internal citations omitted)); *see also Brown v. United States*, 355 F. App'x 901, 905 (6th Cir. 2009) (Tennessee's "locality rule" standard for medical malpractice could not be waived in an FTCA case).

[4] Plaintiff's retained expert Dr. Druckman is a dentist who practices in Colorado (*see* ECF No. 30-3, PageID.468), and splits his practice between general dentistry and treating craniofacial pain (*see id.* at PageID.461). In its reply (ECF No. 31, PageID.644), Defendant argues that the Court should disregard the testimony of Dr. Druckman, because he fails to provide an opinion on the local standard of care or show a basis for his expertise in local general dentistry as required under M.C.L. §

600.2912a(1)(a). S*ee also Turbin v. Graesser*, 214 Mich. App. 215, 218 (1995) (noting that "[a] party offering the testimony of an expert witness must demonstrate the witness' knowledge of the applicable standard of care"). The Court notes that Defendant has not shown the basis of their expert's knowledge of local standard of care, as Dr. Malamed is semi-retired from practice in California and teaches on the west coast. (*See* ECF No. 30-2, PageID.438.) Moreover, in Michigan malpractice actions, the bar for an expert witness to demonstrate her familiarity with the local standard of care is relatively low. *See, e.g.*, *Bahr v*, 448 Mich. at 173 (finding that a proposed expert who practiced in Philadelphia was qualified to opine about the local standard of care in Detroit); *Robins v. Garg*, 276 Mich. App. 351 (2007) (an expert is qualified to testify about the standard of care in an area if she is familiar with the applicable standard of care in a similar area); *Turbin*, 214 Mich. App. at 215 (expert who neither practiced in the area nor verbally communicated with local physicians, but was an experienced, board-certified physician who reviewed written materials about local hospitals, was qualified to testify about the local standard of care).

As the opposing party has no opportunity to address them, new arguments should not be raised in a reply brief. *See Universal Health Grp. v. Allstate Ins. Co.*, No. 09-12524, 2010 WL 2278618, at *4 (E.D. Mich. May 12, 2010), *adopted*, 2010 WL 2287151 (E.D. Mich. June 4, 2010). Courts within the Sixth Circuit routinely decline to consider arguments that appear for the first time in a reply brief. *See G.C. ex rel. Johnson v. Wyndham Hotels & Resorts, LLC*, 829 F. Supp. 2d 609, 614 (M.D. Tenn. 2011) (collecting cases). However, courts have discretion over whether to consider a new argument raised within a reply brief, and inadmissible evidence may not be considered on a motion for summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009) (noting evidence presented by the non-moving party must be capable of presentation in a form that would be admissible at trial in order for that party to withstand summary judgment); *see also Jaiyeola v. Toyota Motor N. Am., Inc.*, No. 19-1918, 2021 WL 518155, at *4 (6th Cir. Feb. 1, 2021) ("Because [the plaintiff] failed to put forth any admissible expert evidence in support of his claims, the district court properly granted the defendants' motion for summary judgment[.]").

Nonetheless, on this motion, the Court need not make a determination as to Plaintiff's showing on the potential admissibility of Dr. Druckman's testimony at trial based on a challenge to his lack of a showing of the local standard of care or a basis for his expertise in local general dentistry. As set forth below, the Court finds that Dr. Druckman's opinion that paresthesia after an IAN block is necessarily evidence of a breach of the standard of care must be excluded for lack of reliability under Federal Rule of Evidence 702. Additionally, regarding all other facets of Plaintiff's malpractice claims, summary judgment is granted to Defendant regardless of

Specifically, Dr. Druckman indicates that "[mechanical trauma to the lingual nerve during an IAN block] is so rare[,]" and that "[t]hat's proof of the fact that the patient . . . can go to the dentist and feel assured that they can get an IAN block and they're . . . not going to have a [sic] paresthesia." (ECF No. 30-3, PageID.469–470.) When asked about the source of his opinion that resultant paresthesia from an IAN block is *per se* evidence of malpractice, Dr. Druckman specifies that the basis for this opinion is solely drawn from an unpublished Michigan Court of Appeals opinion: *Stasser v. Clancy*, No. 329002, 2017 WL 722188, at *2 (Mich. Ct. App. Feb. 23, 2017) (*per curiam*) (finding that severing the lingual nerve during a tooth extraction of a patient with normal anatomy was a violation of the standard of care). (*See* ECF No. 30-3, PageID.469–470, 474.)

For several reasons, the Court declines to find that Plaintiff has demonstrated an inference of malpractice here. To the extent Plaintiff is attempting to invoke the doctrine of res ipsa loquitur, this argument is unavailing. "The issue of whether the doctrine of res ipsa loquitur is

---

whether Dr. Druckman's testimony is admissible or not, because Plaintiff has failed to establish proximate cause.

applicable to a particular case is a question of law." *Pugno v. Blue Harvest Farms LLC*, 326 Mich. App. 1, 19 (2018). "The major purpose of the doctrine of res ipsa loquitur is to create at least an inference of negligence when the plaintiff is unable to prove the actual occurrence of a negligent act . . . ." *Woodard v Custer*, 473 Mich 1, 7 (2005) (quotation marks and citation omitted). The Michigan Supreme Court has outlined a standard which a plaintiff must meet for an inference of negligence to be made:

> In order to avail themselves of the doctrine of res ipsa loquitur, plaintiffs must meet the following conditions:
>
> (1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;
>
> (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant;
>
> (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff; and
>
> (4) evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff.

*Id.* (quotation marks and citation omitted). "Although [a] plaintiff must establish that the event was of a kind that ordinarily does not occur in the absence of negligence, [a] plaintiff must also produce some evidence of wrongdoing beyond the mere happening of the event." *Pugno*, 326 Mich. App. at 19–20.

Here, Plaintiff has not met her burden. Even were the Court to assume for the sake of argument that Dr. Druckman's opinion supports the contention that paresthesia does not occur in the absence of negligence, that this was caused by an instrumentality completely in Dr. Turpin's control, and that Plaintiff's act of jumping up did not contribute to the injury, Plaintiff has nevertheless failed to demonstrate that evidence of the true explanation behind the paresthesia was more readily accessible to Defendant. Indeed, Plaintiff could have undergone exploratory surgery to determine the extent of damage to her lingual nerve, but she did not do so.

Additionally, to the extent Plaintiff relies on Dr. Druckman's opinion as evidence of the standard of care, the Court will not consider Dr. Druckman's opinion that paresthesia following an IAN block necessarily demonstrates a violation of the standard of care occurred. Federal Rule of Civil Procedure 56(c)(2) states that, at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Defendant challenges Dr. Druckman's opinion on this ground under Federal Rule of Evidence 702, arguing that this aspect of

16

his opinion must be excluded from consideration by the Court because it is "wholly unsupported and inadmissible." (ECF No. 31, PageID.647.)

"The opinion testimony of a doctor (whether an expert or a treating physician) generally must pass muster under [Federal] Rule [of Evidence] 702." *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020). As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rule 702 imposes a "gatekeeping" obligation on the courts regarding scientific testimony. *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). "Before a 'witness who is qualified as an expert by knowledge, skill, experience, training, or education may' testify, the party who seeks to call the witness must prove: (1) that 'the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue'; (2) that 'the testimony is based on sufficient facts or data'; (3) that 'the testimony is the product of reliable principles and methods'; and (4) that 'the expert has reliably applied the principles and methods to the facts of the case.'" *Madej*, 951 F.3d at 374 (quoting Fed. R. Evid. 702(a)–(d)). Accordingly, for "expert testimony to be admissible, the court must find the expert to

be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017).

"Rejection of expert testimony is the exception, rather than the rule." *Id.* at 442 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008)). Nevertheless, "[d]istrict courts have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable[.]'" *Madej*, 951 F.3d at 374 (quoting *Kumho Tire*, 526 U.S. at 152).

The Court agrees with Defendant that Dr. Druckman has proffered an unreliable basis for his opinion that paresthesia following an IAN block necessarily demonstrates a violation of the standard of care occurred. Even assuming Dr. Druckman can rely on legal precedent to support a conclusion regarding the applicable standard of care—a proposition of which the Court is by no means convinced—Dr. Druckman's extrapolation of this purported standard of care misinterprets *Stasser*. In *Stasser*, the parties litigated the standard of care regarding the *severing* of a lingual nerve *during a wisdom tooth extraction*. No. 329002, 2017 WL 722188, at \*2. Yet *Stasser* did not in any

18

way suggest that malpractice liability could be demonstrated by the existence of paresthesia, alone—whether following a surgical procedure (e.g., a wisdom tooth extraction) or non-surgical procedure as is the case with an IAN block. The Michigan Court of Appeals explicitly noted that, under the plaintiff's proffered standard of care, "[i]n order to demonstrate a breach of this standard of care, [the] plaintiff was required to show that her lingual nerve was located in the normal anatomical position and that [the] defendant severed the nerve during her wisdom tooth extraction." *Id*. Furthermore, *Stasser* recognized that there was "evidence that the lingual nerve could be cut in the absence of malpractice[,]" though the Michigan Court of Appeals recognized this "was not fatal to [the] plaintiff's claim." *Id*.

Additionally, the evidentiary support of the injury suffered as presented here and in *Stasser* are crucially distinct. In *Stasser*, the plaintiff presented proof that her lingual nerve was severed, whereas here, there is no evidence in the record as to whether Plaintiff's lingual nerve was severed. Indeed, Dr. Druckman relied on Plaintiff's report of experiencing some sensation on her tongue to determine that at least some of the fascicles on Plaintiff's lingual nerve likely remained intact.

19

(*See* ECF No. 30-3, PageID.475.) Additionally, the plaintiff in *Stasser* presented record evidence that the "distal end of [the] plaintiff's nerve was found in the normal anatomical position, [which] made it more likely than not that the proximal portion of the nerve at the point where it was severed also would have been located in the normal anatomical position." *Id*. No such evidence exists regarding the anatomical position of Plaintiff's lingual nerve, before or after the IAN block.[5] Accordingly,

---

[5] In her response to Defendant's motion for summary judgment, Plaintiff asserts that there is evidence that her lingual nerve was in a normal anatomical position. (ECF No. 30, PageID.418, 425.) This is a mischaracterization of the record. Plaintiff points to a portion of Dr. Malamed's deposition in which Dr. Malamed indicates that he has not reviewed anything to have an opinion that Plaintiff's lingual nerve was not in its normal anatomical position. (ECF No. 30-2, PageID.452.) The necessary conclusion of this is that Dr. Malamed *does not have an opinion* on Plaintiff's lingual nerve placement. So, too, with the highlighted portion of Dr. Turpin's deposition, in which Dr. Turpin indicated that until the March 23, 2018 administration of the IAN block, Plaintiff's trigeminal nerve complex (of which the lingual nerve is a part) was normal "[a]s far as [he] could tell[.]" (ECF No. 30-4, PageID.484.) Dr. Druckman does state that Plaintiff's nerves were likely in an anatomically normal location because Dr. Turpin had previously given Plaintiff anesthesia to do a suture for a tooth in a similar location. (*See* ECF No. 30-3, PageID.473; *see also* ECF No. 26-11, PageID.353.) While Dr. Turpin did administer an IAN block to Plaintiff at a previous appointment without paresthesia resulting, this fact, alone, does not necessarily establish that Plaintiff's lingual nerve *was* in an anatomically normal location. For one, Dr. Druckman confirmed that he was unaware of any diagnostic exam or procedure underwent to confirm the exact location of Plaintiff's nerves. (ECF No. 30-3, PageID.473.) Additionally, there is the possibility that Dr. Turpin improperly inserted the needle in the IAN block administered in the previous instance of anesthesia; under that logic, were Plaintiff's lingual nerve in an anatomically abnormal location, such an IAN block could be completed without issue.

*Stasser* does not stand for the proposition that a plaintiff's condition of paresthesia after an IAN block necessarily demonstrates malpractice without more.

Without *Stasser* to rely on, Dr. Druckman offered no basis for his conclusion that the existence of paresthesia following an IAN block demonstrates malpractice. "The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "The 'knowledge' requirement of Rule 702 requires "more than subjective belief or unsupported speculation[.]" *Tamraz*, 620 F.3d at 669–70 (quoting *Daubert*, 509 U.S. at 590). As a result, Dr. Druckman here went "beyond the boundaries of allowable testimony under Rule 702." *Id.*

Accordingly, the Court finds that Dr. Druckman's opinion that paresthesia after an IAN block is necessarily evidence of a breach of the

---

The experts also agree that even in anatomically normal mouths, nerves are not in a precise location among different individuals due to individual anatomical variation (*See* ECF No. 26-3, PageID.273.) Based on the record before it, the Court just cannot know with certainty. Regardless, even were Plaintiff to present conclusive evidence that her nerves were in an anatomically normal location, this would not change the Court's conclusion that *Stasser* is both factually distinguishable and that *Stasser* does not support any finding of presumed malpractice here.

21

standard of care must be excluded for lack of reliability. Because Michigan courts require expert testimony for establishing the applicable standard of care in medical-malpractice cases, *see Kava*, 450 F. App'x at 475, and there is no reliable expert testimony here to support Plaintiff's contention, Plaintiff cannot withstand summary judgment on this ground.

> b)  *Plaintiff has not established that any breach of the standard of care by Dr. Turpin caused Plaintiff's injury*

Without an inference of malpractice, it is necessary for Plaintiff to establish that Dr. Turpin violated the standard of care for administration of an IAN block and that such violation caused Plaintiff's injury. Crucially, the parties disagree as to how the administration of the IAN block injured Plaintiff. As the Court understands it, Plaintiff asserts that Dr. Turpin caused her injury by contacting the lingual nerve while inserting the needle, as evidenced by Plaintiff's jump; instead of properly withdrawing the needle immediately, as required by the standard of care, Dr. Turpin then left the needle in that position while depositing the anesthetic. (ECF No. 30, PageID.424–25.) Furthermore, according to Plaintiff, Dr. Turpin deposited the anesthetic solution directly into the lingual nerve and did so too quickly contrary to the standard of care,

thereby "blowing out" the nerve. (*Id*.) As a result of the fast injection time, the nerve tissue was torn by rapid distension or damaged by the toxicity because it did not have time to adjust to the presence of the anesthetic. (*Id.* at PageID.422).

In contrast, Defendant asserts that Dr. Turpin's needle contacted Plaintiff's lingual nerve at some point during the IAN block administration. (*See* ECF No. 26, PageID.254–255; ECF No. 26-6, PageID.293.) Defendant asserts that Dr. Turpin removed the needle from Plaintiff's mouth after she jumped up and did not reinsert it; therefore, the anesthetic was deposited before Plaintiff jumped. (*Id*.) According to Defendant, because the lingual nerve was numbed enough for Plaintiff to tolerate the fillings, the local anesthetic was therefore injected close to the IAN, but not in or near the lingual nerve. (ECF No. 26, PageID.244, 256–257; ECF No. 26-18, PageID.387.) Defendant thus posits that Plaintiff's numbness during the procedure demonstrates that Dr. Turpin properly placed the needle, deposited the anesthetic in the appropriate place, and removed the needle as soon as Plaintiff reacted. (*See* ECF No. 26, PageID.256–257.)

As an initial matter, the parties' experts—Dr. Druckman; Defendant's retained expert, Dr. Stanley Malamed; and Dr. Turpin[6]—all agree, and Plaintiff concedes (ECF No. 30, PageID.421), that even if a dentist's work is within the standard of care for this procedure, the needle might still contact the nerve. (*See* ECF No. 26-4, PageID.280; ECF No. 26-6, PageID.292–294; ECF No. 26-7, PageID.309; ECF No. 26-9, PageID.333; ECF No. 30-3, PageID.471.) Needle contact with the nerve can cause damage to the nerve, including paresthesia. (*See* ECF No. 26-4, PageID.279; ECF No. 26-3, PageID.270, 272; ECF No. 26-6, PageID.291, 293; ECF No. 26-7, PageID.307.) Furthermore, Dr. Druckman agreed that a patient could be injured if they moved while the needle was inserted in their mouth. (ECF No. 30-3, PageID.471.)

This agreement is crucial in light of the Court's need to evaluate both factual and legal causation under Michigan law. The Michigan Supreme Court has previously outlined the necessary parameters for evaluating causation:

---

[6] Although he is not a retained expert and his treatment of Plaintiff underlies the basis of Plaintiff's amended complaint, Dr. Turpin has practiced dentistry for decades in southeastern Michigan. (*See* ECF No. 26-2, PageID.263; ECF No. 26-5.) An experienced general dentist in this region, Dr. Turpin's testimony may also inform the standard of care for this procedure.

Proximate cause, also known as legal causation, is a legal term of art with a long pedigree in our caselaw. Proximate cause is an essential element of a negligence claim. It "involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." Proximate cause is distinct from cause in fact, also known as factual causation, which "requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." Courts must not conflate these two concepts. We recognize that our own decisions have not always been perfectly clear on this topic given that we have used "proximate cause" both as a broader term referring to factual causation and legal causation together and as a narrower term referring only to legal causation. All this broader characterization recognizes, however, is that "a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries. In a negligence action, a plaintiff must establish both factual causation, i.e., "the defendant's conduct in fact caused harm to the plaintiff," and legal causation, i.e., the harm caused to the plaintiff "was the general kind of harm the defendant negligently risked." If factual causation cannot be established, then proximate cause, that is, legal causation, is no longer a relevant issue.

*Ray v. Swager*, 501 Mich. 52, 63–64 (2017). Accordingly, although there is no dispute that Dr. Turpin's administration of the IAN block was a cause in fact of Plaintiff's injury, Plaintiff must also establish legal

causation.[7] Specifically, expert testimony in medical malpractice cases must draw "a causal connection between the defendant's breach of the applicable standard of care and the plaintiff's injuries." *Craig*, 471 Mich. at 90; *see also Pennington v. Longabaugh*, 271 Mich. App. 101, 104 (2006). Additionally, under MCL 600.2912a(2), a plaintiff in a malpractice action is required to prove causation by a preponderance of the evidence standard. *See* MCL 600.2912a(2) ("In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants.").

In this case, under the causal chain suggested by Defendants—that Dr. Turpin simply contacted the nerve with the needle at some point during the IAN block, causing damage to the nerve—there would be no breach of the standard of care, and legal causation would not be

---

[7] The Court notes that *Craig ex rel. Craig*, setting forth the requirements for a Michigan medical malpractice claim, refers to *proximate* cause. 471 Mich. at 86 (the plaintiff must prove "that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care."). The opinion in *Craig* clears up any confusion that may arise over the use of "proximate" by designating that a cause of action for medical malpractice requires both factual and legal causation. *See id.* at 87 ("'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause.").

established. Considering each aspect of Plaintiff's theory of Dr. Turpin's malpractice in turn, the Court finds that Plaintiff has not drawn this necessary legal causal connection as set forth in *Craig*.

First, contrary to Plaintiff's assertions (ECF No. 30, PageID.418, 425), there is no genuine dispute of fact that Dr. Turpin did not continue with the injection after Plaintiff jumped up. All experts in this case agree that if a dentist knowingly contacts a patient's nerve with her needle during an IAN block administration, the dentist should reposition the needle, and that it would be a violation of the standard of care were the dentist to deposit the anesthetic without withdrawing the needle from a position contacting the nerve. (*See* ECF No. 26-4, PageID.281; ECF No. 30-2, PageID.450, 452; ECF No. 30-3, PageID.468.) The experts also agree that needle contact with the lingual nerve results in an involuntary response from the patient that feels "electric." (*See* ECF No. 26-4, PageID.280; ECF No. 26-6, PageID.293–295; ECF No. 26-9, PageID.333; ECF No. 30-3, PageID.470–471; ECF No. 30-6, PageID.525.)

Here, Plaintiff indicated that after the needle was inserted *and the injection was made*, she felt an "electric tingling" sensation, similar to the reaction described as evidencing a dentist having touched a nerve. (ECF

27

No. 30-5, PageID.515.) Plaintiff further specified that she "jumped" in reaction to the "electric tingling" sensation and yelled. (*Id.*) Furthermore, contrary to Plaintiff's assertions in her response brief (ECF No. 30, PageID.424–425, 427, 430), Plaintiff stated that after her involuntary reaction, Dr. Turpin *removed* the needle. (ECF No. 30-5, PageID.515–516.) There is no evidence in the record to support the contention that Dr. Turpin contacted the lingual nerve *and then* continued with the injection without removing the needle. Accordingly, to the extent that Plaintiff suggests the Court can rely on Dr. Druckman's conclusion that Dr. Turpin violated the standard of care by contacting the nerve with the needle and failing to withdraw or reposition it before injecting the anesthetic solution, causing injury (ECF No. 30, PageID.425; ECF No. 30-3, PageID.469, 472, 474), the Court cannot do so. *See Teal v. Prasad*, 283 Mich. App. 384, 395–96 (2009) (noting that "an 'expert opinion based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and injury,' and 'there must be facts in evidence to support the opinion testimony of an expert.'") (quoting *Skinner*, 445 Mich. at 173).

28

It is unclear whether Plaintiff's theory of malpractice is entirely premised on Dr. Turpin having allegedly inserted the anesthetic into Plaintiff's nerve directly after failing to withdraw the needle from the lingual nerve. If so, that ends the Court's inquiry, and summary judgment in Defendant's favor is appropriate because Plaintiff has not created a genuine issue of material fact as to cause in fact by establishing "a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Patrick v Turkelson*, 322 Mich. App. 595, 617 (2018) (quotation marks and citation omitted).

However, to the extent Plaintiff argues a different causal chain from alleged breaches of the standard of care—from depositing the anesthetic directly into the lingual nerve or, even if not in the nerve directly, depositing it so quickly that the anesthetic toxicity caused nerve damage—these arguments also fail. It is not sufficient for a plaintiff to proffer "a causation theory that, while factually supported, is, at best, just as possible as another theory." *Skinner*, 445 Mich. at 164. "A valid theory of causation, therefore, must be based on facts in evidence" that

"exclude other reasonable hypotheses with a fair amount of certainty." *Craig*, 471 Mich. at 87–88 (quoting *Skinner*, 445 Mich. at 166).

Start with the contention that Dr. Turpin may have unknowingly deposited anesthetic directly into the lingual nerve itself, causing the nerve to fully or partially "blow out." Again, the experts all agree that doing so would be a violation of the standard of care: a dentist is required to watch the patient for signs of distress or other reactions (e.g., bleeding, shock, verbal statements) as indications that the needle was in the nerve, and then, to reposition the needle once contact is made with the nerve before injecting the anesthetic. (*See* ECF No. 26-4, PageID.280–281, 283; ECF No. 30-2, PageID.450, 452; ECF No. 30-3, PageID.468, 470, 473–474.) Indeed, Dr. Druckman indicated that patients always reacted to nerve trauma and he "ha[d] never seen [a circumstance where] the patient didn't respond when I touched a nerve." (ECF No. 30-3, PageID.470–471.) The violation of the standard of care in this case, then, would theoretically be that Dr. Turpin was not watching Plaintiff and thus missed an indication that the needle had entered the nerve, continuing with the anesthetic injection and causing injury.

30

However, there is no evidence in the record to suggest that Plaintiff had a reaction due to or otherwise exhibited signs of nerve contact *before* Plaintiff jumped and yelled after the injection was completed. Furthermore, when asked as to his opinion regarding the specific circumstances leading to Plaintiff's paresthesia, Dr. Druckman indicated that Dr. Turpin *either* tore the nerve with the needle at the time of insertion *or* entered the nerve directly; if the nerve was entered directly, "he could have blown it out." (ECF No. 30-3, PageID.472.) Dr. Druckman explicitly stated that his evidence in support of these conclusions was Plaintiff's paresthesia condition, only.[8] (*Id.*) Even viewing Dr.

---

[8] There is inconclusive evidence regarding whether Dr. Turpin injected the anesthetic in the correct location. It is undisputed that Plaintiff could not have withstood the cavity fillings if her IAN was not successfully blocked or anesthetized. (*See* ECF No. 26-18, PageID.387; ECF No. 30-3, PageID.465.) Dr. Malamed states that the successful block demonstrates that Dr. Turpin deposited the anesthesia in the correct location. In contrast, Dr. Druckman asserts that blowing out the lingual nerve with injected anesthetic would cause the anesthetic to seep into the nearby IAN, and thus the anesthetic would still surround the soft tissues around the IAN as required to anesthetize. (ECF No. 30-3, PageID.473.) Nevertheless, Dr. Druckman also recognized that the finding that Plaintiff had some sensation on the left lateral border of her tongue indicated that some of the fascicles (i.e., nerve fibers) were still intact and that her lingual nerve was not completely blown out. (*Id.* at PageID.475.) Dr. Druckman does not offer any explanation as to what constitutes a partial blow out of the lingual nerve or whether such a partial blow out could result in the anesthetic bathing the IAN. Additionally, Dr. Druckman directly indicated that Dr. Turpin *either* tore the lingual nerve while inserting the needle *or* directly injected the anesthetic into the nerve, possibly causing it to blow out. (ECF No. 30-3, PageID.472.)

Druckman's testimony in the light most favorable to Plaintiff, Dr. Druckman thus only offered several different possibilities as to where the needle could have been placed during the injection: He offers no opinion on whether the medical evidence likely suggested that Dr. Turpin placed the needle in the lingual nerve during the IAN block administration. This does not "exclude other reasonable hypotheses with a fair amount of certainty." *Craig*, 471 Mich. at 87–88 (quoting *Skinner*, 445 Mich. at 166). Just because anesthetic can be directly injected into the lingual nerve and doing so can lead to the nerve being blown out does not mean that either possibility occurred in this case. *See Wiley v. Henry Ford Cottage Hosp.*, 257 Mich. App. 488, 496 (2003) ("An explanation that is consistent with known facts but not deducible from them is impermissible conjecture.")

Additionally, Plaintiff's other theory that Dr. Turpin violated the standard of care by depositing the anesthetic solution too quickly, thereby exerting excess pressure on the nerve and tearing nerve tissue

---

Accordingly, even viewing Dr. Druckman's testimony in the light most favorable to Plaintiff, Dr. Druckman's opinion does not exclude other reasonable hypotheses with a fair amount of certainty—it is, as Dr. Druckman himself admitted (ECF No. 26-3, PageID.272), only a mere "possibility" that Dr. Turpin injected directly into the lingual nerve. *See Craig*, 471 Mich. at 87–88.

or damaging the tissue by increasing toxicity before the nerve could adapt, is also without merit. (*See* ECF No. 30, PageID.421–423.) Here, Dr. Turpin estimated that he usually injects the anesthetic over the course of approximately 15 to 20 seconds. (ECF No. 26-4, PageID.278, 282.)

The parties' experts disagree as to the standard of care on this issue, with Dr. Druckman opining that the standard of care requires an injection time of at least a minute (ECF No. 30-3, PageID.463, 465.) To Dr. Druckman, it is "malpractice" to inject solution in an IAN block between 15 to 20 seconds, because such a fast, forceful injection can cause nerve damage: Specifically, pressure necrosis of the nerve, stemming from the inability of the nerve tissues to accommodate the volume of the solution as it is inserted. (*Id.* at PageID.465–466.) Defendant counters with Dr. Malamed, who opines that "the standard of care [for the speed of an IAN block injection] would be between 15 and 20 seconds, which is faster than recommended, but it's still what they are doing out there in the dental practice in the United States." (ECF No. 26-6, PageID.298; *see also* ECF No. 26-7, PageID.301.)

33

Yet the Court need not determine the standard of care regarding the speed of IAN block injections, because there is no expert testimony regarding causation as applied to Plaintiff's circumstances. As set forth above, expert testimony is required to establish causation in medical-malpractice cases. *See Kava*, 450 F. App'x at 475. It is true that Plaintiff's expert, Dr. Druckman, indicates that an injection completed faster than one minute can cause pressure or excess toxicity, and that this is one of the possible causes of paresthesia. (ECF No. 30-3, PageID.465–468.) However, nowhere in his deposition—or elsewhere in the record—does Dr. Druckman or another expert state that *Plaintiff's* paresthesia could have been caused by rapid injection. The distinction matters. An "expert opinion based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and an injury." *Skinner*, 445 Mich. at 173; *c.f. Staples v. United States*, No. 19-11974, 2021 WL 3489697, at *9 (E.D. Mich. Aug. 9, 2021) (finding that deposition testimony from an expert regarding answers to hypothetical questions pertaining generally to a particular procedure and informed consent for that procedure did not constitute admissions that the standard of care was breached "because an expert must have a medical

34

basis for his opinion and relate it to the patient's symptoms."). Indeed, as stated previously, Dr. Druckman's only opinions connected to Plaintiff's condition were that Dr. Turpin either tore the nerve with the needle at the time of insertion or entered the nerve directly, possibly blowing it out. (ECF No. 30-3, PageID.472.) Without expert testimony connecting Plaintiff's paresthesia to Dr. Turpin's alleged breach of injecting too quickly, Plaintiff cannot prevail on a malpractice claim based on this theory.

"[L]itigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Skinner*, 445 Mich. at 174. Based on the record before the Court, a jury could only guess as to whether Plaintiff's injury was the result of Dr. Turpin solely contacting the nerve at some point during the IAN block or was instead the result of injecting directly into the nerve. Accordingly, the Court grants summary judgment to Defendant on the issue of malpractice stemming from the IAN block administration.

Furthermore, because Plaintiff's claim that Dr. Turpin committed malpractice by not referring her to a more competent doctor to complete the IAN block and fillings are premised upon Dr. Turpin's alleged

35

malpractice in the IAN block administration (*see* ECF No. 4, PageID.21), the Court grants summary judgment on this theory of Plaintiff's malpractice claims as well.

### 2.   Whether Plaintiff established that the informed consent on March 23, 2018 breached the standard of care

Plaintiff separately alleges that Dr. Turpin committed malpractice by failing to gain her informed consent for the IAN block. (*See* ECF No. 4, PageID.21.) "The doctrine of informed consent requires a physician to warn a patient of the risks and consequences of a medical procedure." *Wlosinski v. Cohn*, 269 Mich. App. 303, 308 (2005). Medical malpractice actions based on informed consent require expert testimony as to the standard of care. *See Rogalski v. Smith*, No. 350120, 2020 WL 6111598, at *6 (Mich. Ct. App. Oct. 15, 2020); *see also Adas v. William Beaumont Hosp.*, No. 318397, 2015 WL 7283272, at *7 (Mich. Ct. App. Nov. 17, 2015) (quoting *Paul v. Lee*, 455 Mich. 204, 212 (1997), *overruled on other grounds by Smith v. Globe Life Ins Co*, 460 Mich. 446, 455–56 n 2 (1999)) ("Claims of negligence based on the failure of a physician or surgeon to adequately obtain informed consent before a procedure or to otherwise fail to instruct or advise a patient come within the general rule regarding

the need for expert testimony. . . . [I]f laymen would not necessarily know what information a physician should provide the patient, expert testimony is required.").

Plaintiff does not allege that laymen would know what information a dentist should provide a patient in these circumstances. Instead, Plaintiff points to Dr. Druckman's testimony purportedly as evidentiary support of the contention that the standard of care required Dr. Turpin to inform Plaintiff of the specific risks of the IAN block. (ECF No. 30, PageID.432.) However, while Dr. Druckman indicated that he personally asked for informed consent regarding an IAN block in his own practice, he indicated that "I don't know that you need to do that for fillings." (ECF No. 30-3, PageID.475.) The "standard of care is founded upon how other doctors in that field of medicine would act and not how any particular doctor would act." *Cudnik*, 207 Mich. App. at 382 (quotation marks and citation omitted.) Because Dr. Druckman did not indicate that this is required as part of the standard of care, Plaintiff has failed to provide expert testimony indicating that Dr. Turpin's conduct violated a standard of care regarding informed consent. Accordingly, summary judgment is granted in favor of Defendant on this claim.

### 3. Whether Plaintiff established that Dr. Turpin breached the standard of care by failing to timely refer Plaintiff to an oral surgeon

Defendant also moves for summary judgment on Plaintiff's claim that Dr. Turpin acted below the standard of care in referring her to an oral surgeon two weeks after the injection, instead of the day following the injection, when she reported continuing numbness. (ECF No. 26, PageID.253–254.)

Plaintiff fails to offer expert testimony that the standard of care for an IAN block requires a dentist to refer a patient who experiences numbness after the procedure to be referred to an oral surgeon or neurologist the day following the procedure. *See Kava*, 450 F. App'x at 475. Indeed, Dr. Druckman, Plaintiff's expert, confirmed that it is appropriate for a dentist to wait two weeks to refer a patient to an oral surgeon or a neurologist if numbness following an IAN block has not resolved. (ECF No. 30-3, PageID.475.) Furthermore, the record lacks evidence that a referral to an oral surgeon on April 10, 2018, instead of on March 24, 2018, contributed to Plaintiff's injury. Plaintiff does not contest this aspect of Defendant's motion in her response. Accordingly, the Court grants Defendant summary judgment on this claim.

38

**B.     Claim Regarding Retention of Patient Medical Records**

Defendant does not challenge Plaintiff's contentions that (1) Defendant maintained incomplete and inadequate patient records and failed to furnish records in violation of Michigan Dental Association Standards of Ethics and Code of Professional Conduct, Section 1-B (ECF No. 4, PageID.23–24); and (2) Defendant failed to create and maintain, or alternatively to retain, a record of all dental treatment for 10 years, in violation of the common law and the Michigan Public Health Code, Part 166, Section 333.16644 (*id.* at PageID.24).

However, Plaintiff's amended complaint contains no allegations regarding any factual predicate in support of these claims and the Court did not see factual support for them in the record, either. Furthermore, through independent research, the Court has not found any precedential support suggesting that violation of the Michigan Dental Association Standards of Ethics and Code of Professional Conduct, Section 1-B, or the Michigan Public Health Code, Part 166, Section 333.16644,

39

independently provide a cause of action through which Plaintiff could seek relief.[9]

Federal Rule of Civil Procedure 56(f)(1) provides that "[a]fter giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant." On March 4, 2022, the Court gave notice of its intent to grant summary judgment to Defendant under Federal Rule of Civil Procedure 56(f)(1) regarding any claim stemming from Paragraphs 27 and 28 of the amended complaint and provided Plaintiff the opportunity to file a memorandum "no later than March 11, 2022, setting forth any new arguments as to why Defendant is not entitled to such relief." (ECF No. 34, PageID.657.) To date, Plaintiff has not responded and the deadline for doing so has passed. Accordingly, the Court sua sponte grants summary judgment to Defendant for any claim arising from Plaintiff's allegations in Paragraphs 27 and 28 of the amended complaint. (*See* ECF No. 4, PageID.23–24.)

---

[9] The Court is not confident that violation of the Michigan Dental Association Standards of Ethics and Code of Professional Conduct, Section 1-B or the Michigan Public Health Code, Part 166, Section 333.16644 independently provides a cause of action through which Plaintiff could seek relief. The parties have not briefed this issue, either. Of course, the Court does not have subject matter jurisdiction over a cause of action that does not exist.

## IV.   Conclusion

For the reasons set forth, Defendant's motion for summary judgment (ECF No. 26) is GRANTED. The Court grants summary judgment to Defendant pursuant to Federal Rule of Civil Procedure 56(f)(1) for Plaintiff's claims regarding retention of medical records. Accordingly, Plaintiff's amended complaint (ECF No. 4) is DISMISSED in its entirety.

IT IS SO ORDERED.

Dated: March 15, 2022                    s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 15, 2022.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager